United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARK JOSEPH BRUNA,

        Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

        Defendant.

Case No.: C-12-02147 JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Mark Joseph Bruna ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") denying, in part, his Application for Disability Insurance Benefits ("DIB") under the Social Security Act ("SSA"). Plaintiff filed a Motion for Summary Judgment or Remand ("Plaintiff's Motion"), asking the Court to reverse the Commissioner's partial denial of benefits and order payment of benefits or, in the alternative, to remand for additional proceedings. The Commissioner also filed a Motion for Summary Judgment ("Defendant's Motion"). For the reasons stated below, the Court REVERSES the Commissioner's decision and REMANDS Plaintiff's claim for an award of benefits.[1] Plaintiff's Motion is GRANTED and Defendant's Motion is DENIED.

## II. BACKGROUND

### A. Procedural History

Plaintiff contends that he has been disabled and unable to work since February 1, 2005. On January 16, 2008, he filed a Title II application for a period of disability and DIB. Administrative Record ("AR"), 138. The Commissioner denied his claim on May 20, 2008. *Id*. at 83. On

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1   reconsideration, the Commissioner again denied his claim on September 24, 2008. *Id*. at 94. On

2   October 30, 2008, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). *Id*. at

3   99. A hearing was held on May 4, 2010 in Oakland, California before ALJ Robert P. Wenten. *Id*. at

4   50. On July 26, 2010, the ALJ issued a partially favorable decision. *Id*. at 30. The ALJ found that

5   Plaintiff was disabled and entitled to benefits during the period beginning on February 1, 2005 and

6   ending on April 18, 2008, after which he was ineligible for benefits because he was not disabled. *Id*.

7   at 37-44. On March 6, 2012, the Appeals Council denied Plaintiff's request for a review of the ALJ's

8   ruling. *Id*. at 1, 5. Accordingly, the ALJ's decision became the final decision of the Commissioner.

9       Plaintiff filed this action pursuant to 42 U.S.C. § 405(g), which gives the Court jurisdiction to

10   review the Commissioner's final decision.

11      **B.      Plaintiff's Background**

12      Plaintiff was born on November 9, 1963. *Id*. at 138. He graduated from high school in May,

13   1981. *Id*. at 181. He has worked primarily as a journeyman meat cutter, a manager in the fish and

14   poultry section of a grocery store, and a supervisor in that same section. *Id.* at 183. Plaintiff's last

15   employment ended in 2005. *Id*. at 57, 183. He alleges that he has been disabled since February 1,

16   2005. *Id*. at 138.

17      **C.      Plaintiff's Medical History**

18          **1.      Prior to April 18, 2008**

19              **a.      Treatment History**

20      For about ten years preceding 2005, Plaintiff experienced intermittent lower back pains. *See*,

21   *e.g.*, *id*. at 285, 564-565. Prior to 2005, he sought treatment on only one occasion, apparently in the

22   1990s. *Id*. at 564. His pain worsened to that point that, in early 2005, he was no longer able to work.

23   *Id*. at 285. In February 2005, he sought treatment.

24      Dr. Fred Von Stieff, Plaintiff's physician, referred Plaintiff for radiologic imaging and to

25   several spine specialists. On March 23, 2005, Dr. John R. Lang ("Dr. Lang") evaluated Plaintiff, an

26   MRI, and an x-ray. *Id*. at 342-343. Dr. Lang diagnosed Plaintiff with multilevel degenerative disc

27   disease. Two days later, Dr. David Chow ("Dr. Chow") of the Bay Area Spine Institute evaluated

28   Plaintiff, a Closed MRI of Plaintiff's lumbar spine dated March 4, 2005, and lumbar spine AP/lateral

2

1   x-rays dated February 22, 2005.  *Id*. at 334-337.  Dr. Chow diagnosed Plaintiff with lumbar disc

2   displacement and degenerative disc disease at L3-4, L4-5, and L5-S1, lumbosacral

3   radiculopathy/radiculitis, deconditioning, and hypothyroidism.  *Id*. at 336.

4          Following the initial consultation, Dr. Chow continued to treat Plaintiff.  *Id*. at 327-332, 338-

5   340, 549-551 ("Primary Treating Physician's Progress Reports" completed by Dr. Chow dated April

6   7, 2005, May 18, 2005, June 24, 2005, July 27, 2005).  In his June 24, 2005 report, Dr. Chow

7   concluded that Plaintiff had failed a reasonable trial of conservative treatment consisting of physical

8   therapy, NSAIDS, pain medications, rest, and lumbar epidural steroid injections.  *Id*. at 330.  As a

9   result, Dr. Chow recommended a fluoroscopically-guided lumbar discogram to determine which of

10  Plaintiff's disc protrusions were symptomatic.  *Id*.  The lumbar discogram was completed the next

11  month.  *Id*. at 549.  Dr. Chow reviewed the results of the discogram and the post-discogram CT scan

12  films.  *Id*.  There were posterior annular disc fissures in both the L4-5 and L5-S1 discs, which

13  produced Plaintiff's concordant low back and lower limb pain.  *Id*.  There was no concordant pain

14  response within the L3-4 and L2-3 discs.  *Id*.  Dr. Chow recommended a spine surgery and treatment

15  with Dr. Paul Nottingham ("Dr. Nottingham"), also of the Bay Area Spine Institute.  *Id*. at 549-550.

16         Dr. Nottingham evaluated Plaintiff on August 25, 2005.  *Id*. at 546-547.  Dr. Nottingham

17  diagnosed Plaintiff, based on the above record, with multilevel degenerative disc disease of the

18  lumbar spine with concordant pain at L4-5 and L5-S1 with positive annular fissures.  *Id*. at 547.  Dr.

19  Nottingham noted at that time that he would likely recommend surgical intervention in the form of a

20  two level fusion and, possibly, a noninstrumented lumbar arthrodesis at L3-4 based on MRI findings

21  showing severe disc desiccation at that level.  *Id*.  After several follow-up appointments, a second

22  opinion from Dr. Norman B. Livermore III ("Dr. Livermore"), and a second discogram, Dr.

23  Nottingham went forward with the surgery on April 18, 2006.  *Id*. at 285-287, 370-372, 535-545;

24  (treatment reports dated October 12, 2005, November 22, 2005, December 28, 2005, January 13,

25  2005, March 15, 2006, and March 30, 2006; surgery report).

26         On April 18, 2006, Dr. Nottingham fused the L4-S1 discs and placed an intervertebral body

27  cage prosthesis between each L4-5 and L5-S1.  *Id*. at 370.  Dr. Nottingham also performed a bilateral

28  posterior L3-4 arthrodesis.  *Id*.  Dr. Nottingham provided post-operative care after the surgery.  At

United States District Court
Northern District of California

1  Plaintiff's first post-operative visit, x-rays across the lumbar spine showed that the hardware was in

2  good placement and there was good bone graft at the lateral gutters.  *Id*. at 532.  Follow-up x-rays

3  obtained a month later showed that the hardware remained in good position and demonstrated

4  evidence of solidifying fusion in the disc interspace.  *Id*. at 529.

5       At his third post-surgery follow-up, on July 20, 2006, Plaintiff reported sharp pain in his right-

6  sided low back.  *Id*. at 527.  X-rays obtained at that time showed evidence of solid fusion in the

7  interspace and the left lateral gutter.  *Id*.  The x-rays also showed some loss of disc height at the level

8  above L3-4.  *Id*.  Dr. Nottingham noted his concern that Plaintiff may be experiencing symptoms from

9  adjacent segment degenerative disc disease, but expressed hope that physical therapy would manage

10  Plaintiff's symptoms nonoperatively.  *Id*.

11       On October 13, 2006, Dr. Nottingham reported that Plaintiff was considerably more

12  comfortable than he had been prior to surgery.  *Id*. at 525.  However, Plaintiff continued to suffer back

13  pain with prolonged sitting and standing, and needed to lie down to relieve his symptoms.  *Id*.  At that

14  point, Dr. Nottingham recommended removing the hardware inserted in the first surgery to alleviate

15  some of the residual symptoms.  Plaintiff's condition worsened, and in late November Dr. Nottingham

16  recommended a CT scan and MRI in preparation for hardware removal surgery.  *Id*. at 524.

17       Dr. Nottingham reviewed the CT scan and the MRI scan with Plaintiff the following March.

18  *Id*. at 520.  According to Dr. Nottingham, the reports showed evidence of solid fusion at L4 to S1.

19  *Id*.; *see also id*. at 428-431 (the CT and MRI report).  However, the reports also showed adjacent

20  segment degenerative disease with stenosis at L3-4.  *Id*.  Based on the results, Dr. Nottingham

21  recommended surgical hardware removal, inspection of the fusion mass, and bilateral laminotomies at

22  L3-4.  *Id*.

23       On April 18, 2007, Dr. Nottingham performed a second surgery.  *Id*. at 439-441, 519.  Dr.

24  Nottingham observed solid fusion of L4 to the sacrum and firm psuedoarthrosis with nearly solid

25  fusion at L3-4.  *Id*. at 439.  He removed the hardware from the first surgery.  *Id*. at 439-440.  He

26  removed an overgrowth of bone at the L3-4 level to perform a laminotomy.  *Id*. at 440.  Finally, he

27  repeated a posterior arthrodesis at the L3-4 level and placed a local anesthetic pump.  *Id*. at 439.

28

1    X-rays taken about two weeks after the surgery showed fusion without instrumentation at L5-

2  S1 and severe disc collapse at the L3-4 level, beyond what was seen in lateral views on previous

3  films.  *Id*. at 517.  In mid-June, Plaintiff reported that the modalities, TENS unit, and massage therapy

4  included in his physical therapy were exacerbating his painful symptoms.  *Id*. at 516.  Dr. Nottingham

5  recommended that Plaintiff discontinue these modalities and focus on strengthening and exercise.  *Id*.

6    On August 1, 2007, about three and a half months after the second surgery, Dr. Nottingham

7  noted that Plaintiff was feeling better than he had prior to surgery.  *Id*. at 515.  On September 19,

8  2007, Dr. Nottingham opined that Plaintiff had reached maximum medical improvement.  *Id*. at 514.

9  He noted that continued medical care would be needed, including physical therapy, epidural steroid

10 injections, medications, and possibly further surgery should higher lumbar levels degenerate in the

11 future.  *Id*. at 514-515.  Dr. Nottingham completed an additional progress report on March 12, 2008 in

12 which he noted that Plaintiff continued to suffer back pain with decreased range of motion, but that

13 the pain was manageable.  *Id*. at 755.  Plaintiff did not see Dr. Nottingham again until September 9,

14 2009.  *Id*. at 794.

15         **b.      Evaluation by Dr. Vatche Cabayan**

16    Dr. Vatche Cabayan ("Dr. Cabayan") examined Plaintiff in November 2007 in connection

17 with Plaintiff's workers' compensation claim.  *Id*. at 563-583.  Dr. Cabayan performed a physical

18 examination that showed restricted lumbar range of motion, tenderness in the lumbosacral area and

19 left SI joint, positive supine straight leg raising, atrophy along the calf on the left, and weakness in the

20 quadriceps and hamstring function on the left.  *Id*. at 571-572.  Dr. Cabayan stated that Plaintiff's

21 "capacities include at this time sitting, standing, and walking roughly 15 minutes with suggestion to

22 move on to other activities to prevent stiffness and discomfort.  In an up to eight-hour shift, it appears

23 that [Plaintiff] might have to lie down a couple of times for an hour so that he can typically do six

24 hours of work in a day."  *Id*. at 571.  Dr. Cabayan opined that Plaintiff had "peaked," and could be

25 considered permanent and stationary with some residuals.  *Id*.  In a contemporaneous form Dr.

26 Cabayan completed for social security, he stated that (1) Plaintiff was limited to six hours of work a

27 day; (2) Plaintiff was limited to one and a half hours of standing per day in five to ten minute

28 increments; (3) Plaintiff was limited to four hours of sitting per day in forty-one to fifty minute

increments; and (4) Plaintiff was limited to two hours of walking per day in eleven to twenty minute increments.  *Id*. at 578-579.  Dr. Cabayan noted that Plaintiff would need five to ten minute breaks from sitting and ten to fifteen minute breaks from walking and standing.  *Id*. at 580.  Dr. Cabayan also noted restrictions on Plaintiff's ability to lift, carry, push, and pull weight.  *Id*. at 581.

### 2. On and After April 18, 2008

#### a. Evaluation by Dr. Howard Sturtz

Dr. Howard Sturtz ("Dr. Sturtz") performed a consultive orthopedic evaluation on April 18, 2008.  *Id*. at 761-763.  Dr. Sturtz noted symptoms of pain in the low back with limited range of motion.  *Id*. at 761.  Dr. Sturtz opined that Plaintiff's condition was stable, unlikely to deteriorate with time, and that conservative treatment such as doctor's visits for pain medication may be necessary. *Id*. at 763.  Dr. Sturtz expressed his belief that Plaintiff can stand for forty-five minutes and then may require a change of position, can walk for thirty to sixty minutes and then may require a change of position, and can lift up to twenty pounds.  *Id*.  Dr. Sturtz stated that Plaintiff should be able to perform these activities in an eight-hour day with reasonable periods of rest or a change of position. *Id*.

#### b. State Agency Evaluation by Dr. Huseini K. Haveliwala

Dr. Huseini K. Haveliwala ("Dr. Haveliwala") completed a Physical Residual Functional Capacity Assessment on May 16, 2008.  *Id*. at 764-768.  In it, Dr. Haveliwala stated that Plaintiff could stand and/or walk for six hours in an eight-hour workday.  *Id*. at 765.  Dr. Haveliwala also stated that Plaintiff could sit for six hours in an eight-hour workday, provided Plaintiff may need to stand for five minutes every hour to relieve pain.  *Id*.  Dr. Haveliwala opined that Plaintiff could perform light work with provision for hourly change from the sitting position and some postural limitations.  *Id*. at 770.

#### c. Subsequent Treatment

Plaintiff's next medical visit was to Dr. Nottingham on September 9, 2009.  *Id*. at 794.  At that time, Plaintiff reported that he had been experiencing pain across his back for the last three to four months.  *Id*.  Plaintiff reported that his symptoms were returning to preoperative levels.  *Id*.  Dr. Nottingham obtained x-rays, which showed further collapse of the L3-4 disc compared to x-rays taken

in May 2007. *Id*. The x-rays also showed a large osteophyte formation at the L3-4 level. *Id*. As a result, Dr. Nottingham requested an MRI. *Id*.

The MRI report was completed by Dr. Barbara Ross ("Dr. Ross") on October 8, 2008. *Id*. at 792-793. The images demonstrated:

> T12-L1, L1-2:  1-2 mm broad-based disc bulging is seen.  No foraminal or canal stenosis is seen.
>
> L2-3:  There is 3 mm broad-based circumferential disc bulging is present with central annular tear.  In conjunction with facet joint hypertrophy, there is moderate to marked bilateral, left greater than right, neural foraminal narrowing.  There is no evidence of canal stenosis, however there is mild mass effect on the ventral subarachnoid space.  Ligamentum flavum hypertrophy is present.
>
> L3-4:  Post-operative changes are seen.  There is broad-based disc bulging present.  There is mild left foraminal narrowing.  The right neural foramen and central canal are patent.
>
> L4-5:  Post-operative changes are present.  Prominent soft tissue material is seen extending around the left lateral recess and into the left neural foramen.  Mild bilateral, right greater than left, neural foraminal narrowing is seen.  There is a large multiloculated complex fluid collection seen posteriorly on the left extending to midline from the L3-4 level to the L5-S1 level, most compatible with post-op change.  Comparison post-op study is necessary.
>
> L5-S1:  There is 3 mm broad-based disc bulging present.  In conjunction with facet joint hypertrophy and posterior osteophytic ridging, there is moderate bilateral neural foraminal narrowing.  There is no evidence of canal stenosis.  Post-operative changes are seen.  Soft tissue density is seen along the left at the L4-5 level.
>
> The visualized sacrum is unremarkable in appearance.  There is diffuse atrophy of the posterior paraspinal musculature in the lower lumbar spine.

*Id*. Dr. Ross concluded that there were extensive post-operative changes from L3-4 to L5-S1, straightening and mild reversal of lumbar lordosis, and extensive multilevel degenerative disc changes. *Id*. at 793.

In his October 21, 2009 treatment notes, which are difficult to read, Dr. Nottingham discusses the possibility of transfer of care to a pain specialist, such as Dr. Longton. *Id*. at 791. Dr. William Longton ("Dr. Longton") of Pain Medicine Consultants saw Plaintiff on a referral from Dr. Nottingham on Febraury 2, 2010. *Id*. at 808. Plaintiff reported pain at a 6/10 level. *Id*. at 809. Plaintiff characterized the pain as aching, dull, and throbbing. *Id*. Plaintiff stated that the pain

7

became worse with any activity or movement, excessive work, prolonged sitting, prolonged standing, or prolonged walking. *Id*. The pain was better with lying supine and medication. *Id*. At that time, Plaintiff was taking Norco, Soma, Temazepam, Motrin, and Zantac. *Id*. Dr. Longton also performed a physical evaluation. *Id*. at 810-811. Dr. Longton found that Plaintiff exhibited a slightly antalgic gait, tenderness of the lumbar region and buttocks, reduced range of motion with pain, normal stability, normal muscle strength, and pain upon lateral rotation and extension of the spine. *Id*. at 811. Dr. Longton diagnosed Plaintiff with Lumbar or Lumbosacral Disc Degeneration, Lumbago, Arthrodesis Status, Sleep Disturbance, Spasm of Muscle, and Fasciitis not Otherwise Specified. *Id*. Dr. Longton recommended a switch to long acting opioid medication, and prescribed Cymbalta, Lidoderm, Ms Contin, Nabumetone, Omeprazole, Norco, and Soma. *Id*. at 811-812. He also recommended bilateral L2-3 and bilateral L3-4 medial branch blocks for Plaintiff's back pain. *Id*. at 813. Finally, he recommended hydrotherapy as a physical therapy modality that would likely be helpful for Plaintiff. *Id*.

On March 23, 2010, Plaintiff met Dr. Longton to renew his medication. *Id*. at 802. At that time, according to Dr. Longton's report, Plaintiff was able to provide a specific example of functional improvement due to his pain relieving medications and affirmed that the medications enhanced his ability to perform the activities of daily living. *Id*. A week later, Plaintiff again met Dr. Longton to renew his medication and, evidently, to discuss going forward with medial branch blocks at the L2-3 and L3-4 levels. *Id*. at 799-801. At that time, Plaintiff stated that his pain is worse with prolonged sitting and standing, and eased only a bit with frequent changes of position, ice, and laying in the lateral position. *Id*. at 800. Plaintiff stated that the medications were working well. *Id*. Dr. Longton performed the medial branch block on April 22, 2010. *Id*. at 796-798.

### D.    Administrative Hearing

#### 1.    Plaintiff's Testimony

The ALJ held an administrative hearing on May 4, 2010. *Id*. at 50. Plaintiff testified that he has worked as grocery store manager and journeyman meat cutter. *Id*. at 55-56. Plaintiff's most recent work was as a journeyman meat cutter. *Id*. at 56. Plaintiff testified that his back problems developed gradually over time. *Id*. He has only attempted to work once since January 2005. *Id*. at

57.  That was in March 2005, when he returned to work but was unable to make it through the day. *Id*.

Plaintiff stated that he underwent surgery in April 2006.  *Id*. at 58.  In that surgery, Plaintiff understood that the doctor fused the L5-S1 and L4-L5 levels, and also put in some bone to stabilize the L3-L4 disc.  *Id*. at 57-58.  Plaintiff expressed that he was uncertain exactly what was done at the L3-4 level.  *Id*. at 58.

Plaintiff testified that he had a second surgery in April 2007 that involved hardware removal and a few other things.  *Id*.  Explaining the MRI taken in October 2009, Plaintiff stated that he was feeling better after the second surgery but subsequently "reverted to pre-first surgery."  *Id*. at 59.  The ALJ asked Plaintiff to explain why there was a dearth of medical records for over a year prior to September 2009.  *Id*. at 67.  Plaintiff explained that "[he] was feeling okay then."  *Id*.  Plaintiff elaborated that he returned to the doctor in September 2009 because he had been feeling pain for "pretty much all summer" that year.  *Id*.  Plaintiff stated that the medial branch block, administered a few weeks before the hearing, had only provided a couple days of relief, during which he overdid it. *Id*. at 69.  Plaintiff expressed his desire to engage in physical therapy, particularly in a swimming pool, as his past experience with physical therapy had been limited to a couple of massages that hurt, rather than helped.  *Id*. at 70.  He noted that "they" want to do another fusion at the next level up, but his doctor has advised him that he is too young for such an operation because there is a risk that degeneration will recur at higher levels.  *Id*.

Plaintiff described his pain symptoms as of the hearing.  The pain was focused in Plaintiff's back but could shoot into his legs, typically in the back of his thigh.  *Id*. at 60-61.  Plaintiff also experienced some hip pain but did not know its source.  *Id*.  Plaintiff testified that he was able to walk short distances, noting that he walked from the parking lot to the hearing stopping once to wait for a traffic light and once to wait for a line to get in the building.  *Id*. at 61-62.  He testified that he walks about a block on the street he lives on without the use of any assistive devices.  *Id*. at 63-64.  He noted that standing is worse than walking, although he was able to stand and wait for the traffic light and to stand in the line to enter the building.  *Id*. at 62-63.  Plaintiff stated that he has difficulty getting comfortable in a chair.  *Id*. at 64.  He asserted that the only way for him to get relief is to lie down on

9

his side with a pillow between his legs.  *Id*.  He testified that he spends forty to sixty percent of his

waking hours lying down.  *Id*. at 71.  Plaintiff also testified that he continued to lie down even after

the second surgery.  *Id*. at 72.  Plaintiff stated that he could not sit for forty-five minutes at a time,

stand for fifteen minutes at a time, or walk for thirty minutes at a time.  *Id*. at 65.

Plaintiff stated that he is able to dress, put on his socks, use the bathroom, shower, and drive a

car with a clutch.  *Id*. at 64-65.  Plaintiff testified that he has no difficulty using his arms and hands

provided he is not also using his back.  *Id*. at 65-66.

## 2.       The Vocational Expert's Testimony

The ALJ called on Mary Ciddio ("Ciddio"), a vocational expert, to testify at the hearing.  *Id*. at

74.  Ciddio stated that Plaintiff's past work was primarily as a meat cutter, which is classified with a

heavy strength level.  *Id*. at 75.  Ciddio noted that Plaintiff has also worked as a manager and

supervisor in meat and poultry sales, which in her experience is in the medium strength range.  *Id*.

The ALJ presented Ciddio with a hypothetical person that "could sit for 45 minutes, stand for

15 minutes and walk for 30 minutes and lift 10 pounds, and do those things in sort of rotation

throughout the course of a day."  *Id*.  Ciddio stated that the hypothetical person would be unable to do

Plaintiff's past work.  *Id*.  Ciddio testified that the hypothetical person, with Plaintiff's age, education,

and training, could work as a surveillance system monitor, a gate guard, or sedentary production

work.  *Id*. at 76.  Ciddio explained that working as a surveillance system monitor requires a sedentary

strength level.  *Id*.  Although working as a gate guard is light work, Ciddio noted that there is ample

opportunity to sit or stand in the work.  *Id*.  Finally, Ciddio explained that working in sedentary

production work would allow flexibility sitting or standing at the bench, although Ciddio would erode

50% of the sedentary production positions to account for positions that do not provide that flexibility.

*Id*.  On questioning by Plaintiff's attorney, Ciddio stated that the requirement to lie down for two

hours in an eight hour work day would preclude all employment.  *Id*. at 76-77.  Ciddio also testified

that an individual who was unable to concentrate for 20% of the day or who needed to walk at will for

five to ten minutes every hour would be unable to perform any of the above jobs.  *Id*. at 77.

//

//

1

**E.      The ALJ's Analysis and Findings of Fact**

2

**1.      Background**

3        Disability insurance benefits are available under the Social Security Act when an eligible

4  claimant is unable "to engage in substantial gainful activity by reason of any medically determinable

5  physical or mental impairment … which lasted or can be expected to last for a continuous period of

6  not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  A claimant is

7  only found disabled if his physical or mental impairments are of such severity that he is not only

8  unable to do his previous work but also "cannot, considering his age, education, and work experience,

9  engage in any other kind of substantial gainful work which exists in the national economy."  42

10  U.S.C. § 423(a)(1).  The claimant bears the burden of proof in establishing disability.  *Gomez v.*

11  *Chater*, 74 F.3d 967, 970 (9th Cir. 1996), *cert. denied*, 519 U.S. 881, 117 S.Ct. 209, 136 L.Ed.2d 144

12  (1996).

13        The Commissioner has established a sequential five-part evaluation process to determine

14  whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  At step one,

15  the Commissioner considers whether a claimant is engaged in "substantial gainful activity."  20

16  C.F.R. § 404.1520(a)(4)(i).  If he is, the Commissioner finds that the claimant is not disabled, and the

17  evaluation stops.

18        If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to the

19  step two and considers whether the claimant has "a severe medically determinable physical or mental

20  impairment … or combination of impairments that is severe," which meets the duration requirement

21  in 20 C.F.R. § 404.1509.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it "significantly

22  limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §

23  404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied at this

24  step.

25        If the claimant has one or more severe impairments, the Commissioner will proceed to step

26  three of the analysis, comparing the medical severity of the claimant's impairments to a compiled

27  listing of impairments that the Commissioner has found to be disabling.  20 C.F.R. §

28

United States District Court
Northern District of California

11

404.1520(a)(4)(iii).  If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled.  *Id*.

If the Commissioner does not find the claimant to be disabled at step three, the Commissioner proceeds to step four and considers the claimant's residual functional capacity in light of his impairments and whether the claimant can perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1560(b) (defining past relevant work).  If the claimant can still perform past relevant work, he is found not to be disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant cannot perform past relevant work, the Commissioner performs the fifth and final step of the analysis.  20 C.F.R. § 303.1520(a)(4)(v).

At step five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and work experience, can perform other jobs in the national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (9th Cir. 1997); 20 C.F.R. § 404.1520(a)(4)(v).  A claimant who is able to perform other jobs that are available in significant numbers in the national economy is not considered disabled, and will not receive disability benefits.  20 C.F.R. § 404.1520(f). Conversely, where there are no jobs in the national economy that the claimant can perform, the claimant is found to be disabled.  *Id*.

If the claimant is found disabled at any point in the process, the Commissioner must determine if his disability continues through the date of decision using an eight-step sequential evaluation process.  20 C.F.R. § 404.1594.  At step one, the Commissioner determines whether the claimant is engaging in any substantial gainful activity.  If so, the disability period has ended.  20 C.F.R. § 404.1594(f)(2).  At step two, the Commissioner determines whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. Pt. 404, Subpart P, Appendix I of the Social Security regulations.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  If so, the claimant's disability continues.  20 C.F.R. § 404.1594(f)(2).

At step three, the Commissioner must determine if medical improvement has occurred that results in a decrease in the medical severity of the claimant's impairments.  20 C.F.R. §

United States District Court
Northern District of California

404.1594(f)(3). If so, the analysis proceeds to the fourth step. If not, the analysis proceeds to the fifth step.

At step four, the Commissioner must determine if the medical improvement is related to the ability to work. 20 C.F.R. § 404.1594(f)(4). If so, the analysis proceeds to step six. At step five, the ALJ must determine if an exception to medical improvement applies. 20 C.F.R. § 404.1594(d)-(e), (f)(5). Depending on which exception applies, the analysis may proceed to the sixth step or end at step five with the determination that the claimant is no longer disabled. 20 C.F.R. § 404.1594(f)(5). If no exception applies, the claimant's disability continues. *Id.*

At step six, the Commissioner must determine whether the claimant's impairments in combination are severe. 20 C.F.R. § 404.1594(f)(6). If not, the claimant is no longer disabled. If so, the analysis proceeds to step seven. At step seven, the Commissioner must assess the claimant's residual functional capacity and determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1594(f)(7). If so, the claimant is no longer disabled. If not, the analysis proceeds to step eight. At step eight, the Commissioner must determine whether the claimant can perform any other substantial gainful activity. 20 C.F.R. § 404.1594(f)(8). If so, the claimant is no longer disabled. If not, the disability continues.

### 2. The ALJ's Five-Step Analysis – February 1, 2005 Through April 17, 2008

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since February 1, 2005. AR, 37.

At step two, the ALJ found that Plaintiff has the following severe impairment: degenerative disc disease of the lumbar spine, now status post surgery. *Id*. at 37-38.

At step three, the ALJ found that there was no evidence of the type of nerve root compression, limitation of motion in the spine, motor loss, or sensory reflex loss to meet or medically equal an impairment listed in 20 C.F.R. Pt. 404, Subpart P, Appendix I. *Id*. at 38.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's residual functional capacity from February 1, 2005 through April 17, 2008. *Id*. at 38-40. The ALJ found that, during that time period, Plaintiff was unable to meet the demands of competitive, remunerative work on a sustained and consistent basis at even a sedentary exertion level. *Id*. at 38. In making this finding, the

13

United States District Court
Northern District of California

1  ALJ relied on (1) the failure of conservative treatment in 2005, including physical therapy and

2  epidural steroid injections; (2) x-ray findings, MRI findings, and Dr. Chow's physical evaluation from

3  early 2005; (3) the first discogram in July 2005; (4) Dr. Nottingham's diagnosis of multilevel

4  degenerative disc disease and concordant pain at L4-5 and L5-S1[2] in August 2005; (5) Dr.

5  Livermore's recommendation of lumbar fusion surgery after nine months of failed conservative care

6  in November 2005; (6) the second discography in March 2006; (7) the two back surgeries; (8) the July

7  2007 MRI, after both surgeries, showing four lumbar segment anomalies, degenerative changes at L2-

8  3, and post-surgical changes in the lower lumbar spine; (9) Dr. Nottingham's September 2007 opinion

9  that Plaintiff had reached maximum medical improvement and would be unable to return to his past

10  job as it required heavy lifting and repetitive twisting across the back; (10) Dr. Cabayan's November

11  2007 evaluation; and (11) the March 2008 x-ray showing post-operative changes to the lumbar spine

12  and L2-3 disc degeneration. *Id*. at 38-39. The ALJ afforded much weight to Dr. Cabayan's

13  evaluation, on which he relied to reject the State Agency determination that Plaintiff had the residual

14  functional capacity to perform light work throughout the relevant period. *Id*. at 40. The ALJ adopted

15  Dr. Cabayan's residual functional capacity assessment during that period. *Id*. at 39.

16  At steps four and five, the ALJ concluded that the claimant was unable to perform his past

17  relevant work or any other jobs existing in significant numbers in the national economy in the period

18  from February 1, 2005 through April 17, 2008. *Id*. at 40. The ALJ reached this conclusion in light of

19  his finding that Plaintiff was unable to meet the demands of basic work related activities during that

20  time period. *Id*.

21  ### 3. The ALJ's Eight-Step Analysis – April 18, 2008 Onward

22  At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since

23  February 1, 2005. *Id*. at 37.

24  At step two, the ALJ found that Plaintiff has the following severe impairment: degenerative

25  disc disease of the lumbar spine, now status post surgery. *Id*. at 37-38.

26

27  ———————————

28  [2] The ALJ states that "Dr. Livermore diagnosed multilevel degenerative disc disease and concordant pain at L4 – 5 and L5 – S1 in August 2005 (Exhibit 12/36)." In the next sentence, the ALJ discusses Dr. Livermore's opinion from November 2005, found at Exhibit 2F/2. In the quoted sentence, the ALJ appears to have been referring to Dr. Nottingham's August 2005 diagnosis, which the ALJ properly describes, and can be found at page 36 of Exhibit 12F.

1    Combining steps three, four, and six, the ALJ found that Plaintiff had experienced medical

2    improvement related to his ability to work as of April 18, 2008, after which he had the residual

3    functional capacity to perform work allowing for alternating positions after standing for fifteen

4    minutes, sitting for forty-five minutes, and walking for thirty minutes, allowing for reasonable periods

5    of rest over an eight hour day. *Id*. at 40-42.  The ALJ also found that Plaintiff is limited to lifting ten

6    pounds and bending occasionally. *Id*.  In making this finding, the ALJ relied on:  (1) progressive

7    improvement in Plaintiff's back pain and other symptoms following surgery, as reflected in his

8    medical records; (2) Dr. Sturtz's April 18, 2008 evaluation and his conclusions drawn therefrom, in

9    particular Dr. Sturtz's conclusion that Plaintiff was then able to stand for forty-five minutes, sit for

10   one hour, and walk for thirty to sixty minutes before possible needing a change of position; (3)

11   Plaintiff's statements to Dr. Sturtz that (a) the April 2006 surgery helped and there had been no

12   change in his symptoms after hardware removal; (b) that he was experiencing back pain with limited

13   range of motion only and had limited radiation to the lower extremities; and (c) that he was able to

14   stand for fifteen minutes, sit for forty-five minutes, and walk for thirty minutes; and (4) the absence of

15   evidence in the medical records that Plaintiff experienced any significant deterioration in his condition

16   after the examination by Dr. Sturtz. *Id*. at 40-41.  The ALJ noted that Plaintiff reported that he had

17   been experiencing increased pain for three to four months, and that pain was approaching pre-

18   operative levels, when he saw Dr. Nottingham in September 2009. *Id*. at 41.  The ALJ also noted that,

19   at that time:  (1) x-rays showed further collapse of the L3-4 disc; (2) Dr. Nottingham diagnosed

20   further degenerative changes above the level of Plaintiff's fusion at L3-4; and (3) an MRI showed

21   post-operative changed from L3-4 to L5-S1, including fluid collection and extensive multilevel

22   degenerative disc changes. *Id*.  On the other hand, the ALJ noted that Dr. Nottingham recommended

23   only conservative treatment, and that Plaintiff's workers' compensation matter was settled shortly

24   thereafter. *Id*.  The ALJ suggested that settlement of the workers' compensation case may have

25   influenced Plaintiff's "presentation" of his symptoms without "suggest[ing] that he was less than

26   truthful." *Id*.  The ALJ also relied on Plaintiff's treatment by Dr. Longton beginning in February

27   2010, in particular Plaintiff's report in March 2010 that the medications he was taking were working

28   well and that he had experienced functional improvement. *Id*.

In reaching this conclusion, the ALJ rejected Plaintiff's statements regarding his symptoms since April 18, 2010. *Id*. at 42. The ALJ cited the following "specific and legitimate reasons": (1) by January 2008 Plaintiff told the Administration that he was able to do some shopping and chores and was able to drive; (2) by April 2008 Plaintiff told Dr. Sturtz that he was able to stand for fifteen minutes, sit for forty-five minutes, walk for thirty minutes, and lift ten pounds; (3) in March 2010 Plaintiff reported that the medications he was taking were working well and that he experienced functional improvement; and (4) that at the hearing Plaintiff reported that his symptoms following his surgeries and that, while he experienced increased symptoms in September 2009, he can now walk one block and drive a car even with a clutch. *Id*.

At step seven, the ALJ found that Plaintiff remained unable to perform his past relevant work. *Id*. At step eight, considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that Plaintiff has been able to perform a significant number of jobs in the national economy beginning on April 18, 2008. *Id*. at 43. The ALJ relied on Ciddio's testimony that Plaintiff would be able to perform work as a surveillance system monitor (DOT # 379.367-010), a gate guard (DOT # 372.667-030), and a production worker (DOT # 739.687-086). *Id*. The ALJ noted that work as a surveillance system monitor and production worker is classified as sedentary, whereas work as a gate guard is classified as light work. *Id*. The ALJ found that Ciddio's testimony was consistent with the dictionary of occupational titles. *Id*. Moreover, the ALJ found that the questions raised by Plaintiff's attorney imposed additional restrictions, based on Dr. Cabayan's report. *Id*. The ALJ found no support for those restrictions after April 18, 2008. *Id*. Therefore, the ALJ accepted Ciddio's testimony and concluded that there are jobs existing in significant numbers in the local and national economies that Plaintiff can perform. *Id*.

## F.    Contentions of Parties

### 1.    Plaintiff's Contentions

Plaintiff asserts four points of error, and argues that, as a result, his claim should be remanded for payment of benefits. First, Plaintiff contends that the ALJ did not provide clear and convincing reasons for disbelieving Plaintiff's testimony. Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion"), 10-13; Plaintiff's Reply in Support of Summary Judgment ("Plaintiff's Reply"), 1-3.

1   Plaintiff states that the "clear and convincing" standard is appropriate because there was no evidence

2   of malingering in the record.  Plaintiff's Motion, 10; Plaintiff's Reply, 1-2.  Plaintiff argues that the

3   ALJ erroneously rejected his testimony that he is required to lie down with a pillow between his legs

4   forty to sixty percent of the time.  Plaintiff's Motion, 11; Plaintiff's Reply, 2-3.  Plaintiff asserts that

5   each of the ALJ's bases for rejecting Plaintiff's testimony as to the disabling effect of his symptoms

6   beginning April 18, 2008 is misplaced.  Plaintiff's Motion, 11-13; Plaintiff's Reply, 3.

7           Plaintiff states that the ALJ's bases were:  (1) the pain questionnaire in which Plaintiff

8   reported performing some shopping and household chores; (2) Plaintiff's statement to Dr. Sturtz on

9   April 18, 2008 that he could stand for fifteen minutes, walk for thirty minutes, sit for forty-five

10  minutes, and lift ten pounds; (3) Plaintiff's statements to Dr. Longton in early 2010 that his

11  medications were working well; and (4) Plaintiff's testimony that his symptoms improved after the

12  surgeries and that he was able to walk a block and drive a car with a clutch at the time of the hearing.

13  Plaintiff's Motion, 11-13; Plaintiff's Reply, 3.  Plaintiff contends that these statements do not

14  contradict Plaintiff's other statements pertaining to his need to lie down.  Plaintiff's Motion, 11-13;

15  Plaintiff's Reply, 3.  Moreover, Plaintiff asserts that none of the statements reflect adversely on

16  Plaintiff's credibility.  Plaintiff's Reply, 3.

17          Second, Plaintiff argues that the ALJ erred by relying on vocational expert testimony that

18  contradicted the dictionary of occupation titles.  Plaintiff's Motion, 13-17; Plaintiff's Reply, 4-6.

19  Plaintiff asserts that the vocational expert's testimony that someone with the hypothetical limitations

20  would be able to perform work under the specified positions in the dictionary of occupational titles

21  substantially conflicted with the definitions in the dictionary.  Plaintiff's Motion, 14-16; Plaintiff's

22  Reply, 4-5.  Plaintiff contends that, at step five, the ALJ erroneously concluded that the expert's

23  testimony was consistent with the dictionary of occupational titles.  Plaintiff's Motion, 16; Plaintiff's

24  Reply, 5 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

25          Third, Plaintiff contends that the hypothetical propounded to the vocational examiner did not

26  describe Plaintiff's limitations as found by the ALJ.  Plaintiff's Motion, 17-19; Plaintiff's Reply, 7.

27  Specifically, Plaintiff states that the hypothetical omitted Plaintiff's need for reasonable periods of

28  rest.  Plaintiff's Motion, 18; Plaintiff's Reply, 7.  Plaintiff notes that the vocational examiner testified

United States District Court
Northern District of California

17

that none of the positions would be available if Plaintiff additionally needed to walk around at will for five to ten minutes an hour.  Plaintiff's Motion, 18.  Because the "reasonable periods of rest" were absent from the hypothetical, and were undefined, Plaintiff asserts that the Commissioner failed to meet its burden at step five of showing that there was alternative work that Plaintiff could perform.  Plaintiff's Reply, 7.

Fourth, Plaintiff argues that the ALJ did not provide adequate reasons for rejecting Dr. Cabayan's opinion.  Plaintiff's Motion, 19-20; Plaintiff's Reply, 7-8.  Plaintiff asserts that the ALJ rejected Dr. Cabayan's opinion as to Plaintiff's need for rest periods beginning on April 18, 2008.  Plaintiff's Motion, 20.  Plaintiff argues that there was no evidence of progressive improvement to support this rejection, but rather that the MRI in October 2009 shows deterioration.  *Id*.  Moreover, Plaintiff argues that Dr. Sturtz agreed that rest periods were required, but did not elaborate what was reasonable.  *Id*.  Plaintiff asserts that there is no objective evidence of a change in function between Dr. Cabayan's report and Dr. Sturtz's report that would render Dr. Cabayan's report obsolete.  Reply, 7-8.

## 2.    Defendant's Contentions

Defendant opposes each of Plaintiff's four points of error.  First, Defendant argues that the ALJ properly considered Dr. Cabayan's opinion.  Defendant's Motion, 2-4.  Defendant states that the ALJ did not reject Dr. Cabayan's opinion, but gave it great weight.  *Id*. at 2.  Defendant asserts that the ALJ's conclusion that Plaintiff subsequently improved was supported by substantial evidence in the record, in particular Plaintiff's statements to Dr. Sturtz and Dr. Sturtz's evaluation.  *Id*. at 3-4.  Defendant contends that there is no evaluation showing that Plaintiff was more restricted since April 18, 2008.  *Id*. at 4.

Second, Defendant asserts that the ALJ did not arbitrarily reject Plaintiff's testimony about his symptoms.  *Id*. at 4-7 (citing *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (for the "arbitrarily discredit" language).  Defendant states that the ALJ need not believe every allegation of disability.  *Id*. at 4-5.  Defendant contends that the ALJ provided specific reasons, supported by substantial evidence, that Plaintiff was not more limited than described by the residual functional capacity after April 18, 2008.  *Id*. at 5.  Defendant argues that the ALJ properly considered Plaintiff's

United States District Court
Northern District of California

1    ability to perform household chores and shop, Plaintiff's statements to Dr. Sturtz, and Plaintiff's

2    statements regarding the effectiveness of his medication.  *Id*. at 5-6 (citing *Tommasetti v. Astrue*, 553

3    F.3d 1035, 1039-1040 (9th Cir. 2008); *Thomas*, 553 F.3d at 958-959; *Burch v. Barnhart*, 400 F.3d

4    676, 680 (9th Cir. 2005)).  Defendant contends that the ALJ properly considered Plaintiff's allegations

5    in light of the medical record, indicating increased functionality after both surgeries.  *Id*. at 6.

6    Defendant disputes whether Plaintiff reported to Dr. Sturtz that he needed to lie down for forty to

7    sixty percent of waking hours, as there is no record of such a statement.  *Id*. at 6-7.  Defendant also

8    notes that, in the January 2008 pain questionnaire, Plaintiff reported that he alleviated his pain with

9    medication, a back brace, and "just rest," but never mentioned a specific need to lie down.  *Id*. at 7.

10        Third, Defendant argues that the ALJ presented a complete hypothetical question to the

11   vocational expert.  *Id*. at 7-8 (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (for the

12   proposition that the ALJ need only pose a hypothetical that contains the limitations the ALJ found

13   both credible and supported by substantial evidence in the record)).  Defendant contends that the

14   ALJ's hypothetical person that can sit for forty-five minutes, stand for ten minutes, and walk for thirty

15   minutes "in sort of a rotation throughout the course of the day" was consistent with the ALJ's residual

16   functional capacity determination that Plaintiff could "perform work allowing for alternating positions

17   after standing for fifteen minutes, sitting for forty-five minutes, and walking for thirty minutes … and

18   allowing for reasonable periods of rest over an eight hour day."  *Id*. at 7.   Defendant asserts that the

19   inclusion of "reasonable periods of rest" does not mean that Plaintiff had to have frequent rest breaks.

20   *Id*. at 8.  Defendant notes that the ALJ found no basis for the additional restrictions included in the

21   questions posed to the vocational expert by Plaintiff's counsel.  *Id*.  Defendant argues that the ALJ's

22   inclusion of "reasonable periods of rest" was based on Dr. Sturtz's report, which treated "reasonable

23   periods of rest" as "reasonable change of position."  *Id*.  To the extent that the ALJ was including a

24   requirement for reasonable rest breaks, Defendant asserts that there is nothing to demonstrate that this

25   would mean any more than "normal" rest breaks, or that such normal rest breaks would be available at

26   the jobs Ciddio identified.  *Id*.

27        Fourth, Defendant contends that the ALJ properly relied on Ciddio's testimony.  *Id*. at 8-10.

28   (citing *Bayliss*, 427 F.3d at 1218 (for the proposition that the "ALJ may take administrative notice of

19

United States District Court
Northern District of California

1   any reliable job information, including information provided by a VE")).  Defendant argues that

2   Ciddio's testimony did not conflict with the dictionary of occupational titles because Plaintiff can

3   perform work within a range identified in the dictionary, and there is no conflict where the agent

4   presents more specific information about the jobs.  *Id*. at 9 (citing SSR 00-4p).  Defendant states that

5   Ciddio explained any possible inconsistencies between the listed positions and the ALJ's hypothetical,

6   and eroded the available positions accordingly.  *Id*.  Defendant asserts that any error in not explicitly

7   asking Ciddio if her testimony was consistent with the dictionary of occupational titles was harmless

8   because, to the extent any conflict existed, Ciddio provided sufficient support for her conclusion such

9   that there was  no impact on the outcome of the case.  *Id*. at 9-10 (citing *Massachi*, 486 F.3d at 1154

10   n.19 (9th Cir. 2007)).

11   **III.    ANALYSIS**

12       **A.    Legal Standard**

13       In reviewing the Commissioner's decision, the Court takes as conclusive any findings of the

14   Commissioner that are free from legal error and "supported by substantial evidence."  42 U.S.C. §

15   405(g).  Substantial evidence is "such evidence as a reasonable mind accepts as adequate to support a

16   conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

17   Substantial evidence means "more than a mere scintilla" but "less than a preponderance."  *Id.*;

18   *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988).  Even if the

19   Commissioner's findings are supported by substantial evidence, they should be set aside if proper

20   legal standards were not applied when using the evidence to reach a decision.  *Benitez v. Califano*,

21   573 F.2d 653, 655 (9th Cir. 1978).  In reviewing the record, the Court must consider both the evidence

22   that supports and detracts from the Commissioner's conclusion.  *Smolen*, 80 F.3d at 1279 (citing

23   *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

24       **B.    Whether the ALJ Erred in Determining Plaintiff's Residual Functional Capacity**

25       Since April 18, 2008, the ALJ found that Plaintiff "has had the residual functional capacity to

26   perform work allowing for alternating positions after standing for 15 minutes, sitting for 45 minutes,

27   and walking for 30 minutes, lifting of 10 pounds, and occasional bending and allowing for reasonable

28   periods of rest over an 8 hour day."  AR, 40.  Plaintiff argues that the ALJ erred in reaching this

20

determination by (1) rejecting Dr. Cabayan's opinion during the period beginning April 18, 2008; and (2) rejecting Plaintiff's testimony as to the severity of his symptoms in the period beginning April 18, 2008.  As discussed below, the ALJ erred (1) by implicitly rejecting Dr. Cabayan's opinion without providing specific and legitimate reasons; and (2) by discrediting Plaintiff's testimony as to the severity of his symptoms in the period beginning April 18, 2008.

### 1.      Treatment of Dr. Cabayan's Opinion

#### a.      Medical Improvement Standard

In cases involving the termination of disability benefits, the Commissioner must determine "if there has been any medical improvement in [a claimant's] impairment(s) and, if so, whether this medical improvement is related to [the claimant's] ability to work."  20 C.F.R. § 404.1594(a). Although the Ninth Circuit has not yet addressed whether this standard also applies to cases involving closed periods of disability, the Circuits that have are largely in agreement that it does. *See Waters v. Barnhart*, 276 F.3d 716, 718-719 (5th Cir. 2002) (holding that "in closed period cases, the ALJ engages in the same decision-making process as in termination case" and therefore, that the medical improvement standard applies to the cessation date in closed period cases); *Shepherd v. Apfel*, 184 F.3d 1196, 1200-1201 (10th Cir. 1999); *Jones v. Shalala*, 10 F.3d 522, 524 (7th Cir. 1993) (same); *Chrupcala v. Heckler*, 829 F.2d 1269, 1274 (3d Cir. 1987) (same); *Pickett v. Bowen*, 833 F.2d 288, 291-292 (11th Cir. 1987).  This Court has previously found the reasoning of these cases to be persuasive and therefore applies the medical improvement standard applies to the question of whether Plaintiff's disability ended on April 18, 2008 in this case.  *See Garcia v. Astrue*, 2008 WL 4104342, at *7 (N.D. Cal. Sep. 4, 2008).

In *Shepherd v. Apfel*, the court described the framework for applying the medical improvement test as follows:

> To apply the medical improvement test, the ALJ must first compare the medical severity of the current impairment(s) to the severity of the impairment(s) which was present at the time of the most recent favorable medical decision finding the claimant disabled. *See id.* at § 404.1594(b)(7). Then, in order to determine that medical improvement is related to ability to work, the ALJ must reassess a claimant's residual functional capacity (RFC) based on the current severity of the impairment(s) which was present at claimant's last favorable medical decision. *See id.* at § 404.1594(c)(2). The ALJ must then compare the new RFC with the RFC before the putative medical improvements. The ALJ may find medical improvement related to

1    an ability to do work only if an increase in the current RFC is based on objective medical
     evidence.

2

3    184 F.3d at 1201. The Commissioner bears the burden of establishing that a claimant has experienced

4    medical improvement that would allow him to engage in substantial gainful activity. *Murray v.*

5    *Heckler*, 722 F.2d 499, 500 (9th Cir. 1983). However, the court may set aside the ALJ's decision

6    only when the decision is not supported by substantial evidence or the decision is premised on legal

7    error. *Bayliss*, 427 F.3d at 1214 n.1.

8                   **b.    Standard for Rejecting the Opinion of an Examining Physician**

9           In the Ninth Circuit, courts "distinguish among the opinions of three types of physicians: 1)

10   those who treat the claimant (treating physicians); 2) those who examine but do not treat the claimant

11   (examining physicians); and 3) those who neither examine nor treat the claimant (nonexamining

12   physicians)." *Lester*, 81 F.3d 821, 830 (9th Cir. 1995). In *Lester*, the court set forth the general

13   standards that are applied in determining the relative weight to be given to the medical opinions of the

14   three types of physicians. *Id*. Relevant here is the portion concerning examining physicians:

15

16          The opinion of an examining physician is, in turn, entitled to greater weight than the opinion
            of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v.*
17          *Heckler*, 753 F.2d 1450 (9th Cir. 1984). As is the case with the opinion of a treating
            physician, the Commissioner must provide "clear and convincing" reasons for rejecting the
18          uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the
            opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by
19          another doctor, can only be rejected for specific and legitimate reasons that are supported by
            substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).
20

21   *Id*. at 830-831.

22                  **c.    Application to Facts**

23          The ALJ afforded Dr. Cabayan's November 2007 opinion much weight in the period

24   preceding April 18, 2008. AR, 40. The ALJ recited Dr. Cabayan's conclusion that Plaintiff "could

25   work no more than six hours per day with breaks [and] would need to lie down every two hours for

26   one hour during the day to relieve his pain," among other restrictions. *Id*. at 39. The ALJ adopted Dr.

27   Cabayan's opinion as his residual functional capacity determination. *Id*. at 40. However, the ALJ did

28   not mention Dr. Cabayan's opinion determining Plaintiff's residual functional capacity in the period

United States District Court
Northern District of California

United States District Court
Northern District of California

following April 18, 2008.  Rather, the ALJ relied on medical records confirming progressive

improvement in Plaintiff's back pain following surgery, Plaintiff's statements to Dr. Sturtz, Dr.

Sturtz's report, and subsequent treatment in late 2009 and early 2010 by Dr. Longton and Dr.

Nottingham.  *Id*. at 40-42.

Contrary to the ALJ's implication, made without citation to the record, the medical records do

not confirm progressive improvement in Plaintiff's back pain following surgery and continuing until

after Dr. Cabayan's report. The records provided by Dr. Nottingham, Plaintiff's treating physician,

reflect improvement for a limited time after surgery.  In his September 19, 2007 follow-up report, Dr.

Nottingham opined that Plaintiff had reached maximum medical improvement.  *Id*. at 514.  Dr.

Nottingham also expressed that Plaintiff would require ongoing medical care, potentially including

further surgery, physical therapy, epidural steroid injections, and ongoing medications.  *Id*.  Likewise,

Dr. Cabayan opined that Plaintiff's recovery had peaked in his November 2007 evaluation.  *Id*. at 571.

Nevertheless, the ALJ did not acknowledge the necessary conflict between his finding, on the basis of

Dr. Sturtz's evaluation, that Plaintiff's condition had medically improved between November 2007

and April 18, 2008 such that Plaintiff no longer required two hours to lie down and rest during an

eight hour workday, and Dr. Cabayan's evaluation.  As a result, the ALJ did not articulate any

reasons, much less specific and legitimate reasons, for rejecting the contradicted opinion of Dr.

Cabayan in the period following April 18, 2008.

### 2.    Treatment of Plaintiff's Testimony

A claimant's credibility is the degree to which the claimant's statements can be believed and

accepted as true.  SSR 96-7p at 4.  The ALJ must make credibility findings to determine the truth of a

claimant's description of her symptoms and pain.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.

1996) (holding ALJ responsible for determining credibility and resolving conflicts in medical

testimony).  When making such findings, the ALJ "must consider the entire case record and give

specific reasons for the weight given to the [claimant's] statements.  The reasons for the findings must

be grounded in the evidence and articulated in the determination or decision."  *Id*.  First, the ALJ must

determine whether the claimant has submitted objective medical evidence of the underlying

impairment "which could reasonably be expected to produce the pain or other symptoms alleged."

1   *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).  Second, if the claimant meets the first

2   step and there is no affirmative evidence of malingering, the ALJ must provide "clear and convincing"

3   reasons for rejecting the claimant's testimony.  *Id.*

4       The Ninth Circuit has articulated several factors that can be considered in determining whether

5   a claimant's symptom testimony is credible.  These include the claimant's "reputation for truthfulness,

6   inconsistencies either in his testimony or between his testimony and his conduct, his daily activities,

7   his work record, and testimony from physicians and third parties concerning the nature, severity, and

8   effect of the symptoms of which he complains."  *Light v. Soc. Sec. Administration*, 119 F.3d 789, 792

9   (9th Cir. 1997).  If the ALJ's credibility finding is supported by substantial evidence in the record, the

10  Court may not second-guess the ALJ's finding.  *Thomas*, 278 F.3d at 959.

11      Here, Plaintiff submitted objective medical evidence of his degenerative disc disease.  There is

12  no dispute that his degenerative disc disease could reasonably be expected to cause his alleged back

13  pain.  Moreover, there is no affirmative evidence of malingering on the record.  Therefore, the ALJ

14  may reject Plaintiff's testimony about his symptoms only based on specific, clear and convincing

15  reasons supported by substantial evidence in the record.  The ALJ did not do so.

16      As noted above, the ALJ discredited Plaintiff's testimony as to the scope of his symptoms

17  after April 18, 2008 because:  (1) by January 2008 Plaintiff told the Administration that he was able to

18  do some shopping and chores and was able to drive; (2) by April 2008 Plaintiff told Dr. Sturtz that he

19  was able to stand for fifteen minutes, sit for forty-five minutes, walk for thirty minutes, and lift ten

20  pounds; (3) in March 2010 Plaintiff reported that the medications he was taking were working well

21  and that he experienced functional improvement; and (4) that at the hearing Plaintiff reported that his

22  symptoms improved following his surgeries and that, while he experienced increased symptoms in

23  September 2009, he can now walk one block and drive a car even with a clutch.  AR, 42.  The ALJ

24  did not clarify the specific testimony he was rejecting.  Plaintiff takes issue with the ALJ's evident

25  rejection of his testimony pertaining to his need to lie down for a substantial portion of the day.  *See*

26  *id.* at 71 (Plaintiff's testimony that he spends "40 to 60 percent of [his] waking hours" lying down for

27  pain relief).  If credited, this testimony would have rendered him disabled.  *Id.* at 76-77.

28

United States District Court
Northern District of California

24

1    First, the Plaintiff stated on the January 2008 pain questionnaire that he did "some shopping"

2  and "household chores when feeling up to it."  AR, 214; *see also Thomas*, 278 F.3d at 959 (ability to

3  perform various household chores such as cooking, laundry, washing dishes, and shopping was one of

4  several clear and convincing reasons for discounting the plaintiff's testimony as to the disabling

5  nature of her pain and impairments).  However, Plaintiff's ability to do some unspecified chores and

6  shopping does not conflict with his need to lie down during the day.  Importantly, the ALJ found that

7  Plaintiff continued to be disabled, in spite of these statements, until April 18, 2008 relying on Dr.

8  Cabayan's testimony that Plaintiff needed to lie down two hours of an eight hour workday to relieve

9  his pain symptoms.  Likewise, Plaintiff's statements at the hearing that he could drive a car with a

10  clutch and walk a block do not conflict with his need to lie down during the day to control his pain.

11    Second, Plaintiff's statement to Dr. Sturtz that he was able to stand for fifteen minutes, sit for

12  forty-five minutes, walk for thirty minutes, and lift ten pounds is not a clear and convincing reason for

13  rejecting his testimony as to the disabling nature of his impairments.[3]  Plaintiff's statement to Dr.

14  Sturtz, does demonstrate some improvement relative to his earlier statement to Dr. Cabayan:  That he

15  could stand for ten minutes, sit for forty-five minutes, walk for fifteen minutes, and lift fifteen pounds.

16  AR, 568.  However, the statement says nothing as to Plaintiff's ability to continue engaging in these

17  activities throughout the day without taking breaks to lie down.  The record does not reflect any

18  statement made by Plaintiff to the effect that he could rotate between these activities such that he

19  could stand approximately one hour and twenty minutes, sit for approximately four hours, and walk

20  for approximately two hours and forty minutes, with reasonable rest breaks, in an eight hour workday.

21  The ALJ's determination that Plaintiff is not disabled relied on a hypothetical in which Plaintiff could

22  repeat each task throughout the day with reasonable rest breaks.  Plaintiff's statement to Dr. Sturtz in

23  no way contradicts Plaintiff's need for additional breaks to lie down or walk at will, limitations that

24  would warrant a finding of disability.  *See id*. at 76-77.

25    Third, Dr. Longton's report from March 2010 reflects that "[t]he patient is here today in order

26  to confirm that the controlled substances they are prescribed are providing them with a meaningful

27

28  [3] Plaintiff's statement to Dr. Sturtz was also not a clear and convincing reason to reject Plaintiff's testimony at the hearing
that he was unable to perform any of those activities aside from lifting ten pounds.  AR, 65.  Over two years had passed
since Dr. Sturtz's examination, and Plaintiff had provided evidence of a recent deterioration in his condition.

United States District Court
Northern District of California

1   degree of pain relief.  The patient is able to provide a specific example of functional improvement due

2   to their use of pain relieving medications." *Id.* at 802.  However, as with Plaintiff's statement to Dr.

3   Sturtz, these vague recitations say nothing as to Plaintiff's ability to complete an eight hour workday

4   without spending two hours lying down to rest.  The statement is not inconsistent with that continued

5   need.  It is not a clear and convincing reason to reject his testimony regarding his need to lie down

6   during the day.

7          Fourth, Plaintiff's report that his symptoms improved for a limited time following his

8   surgeries also does not conflict with his need to lie down.[4]  Moreover, the MRI in October 2009

9   showed that Plaintiff's condition deteriorated following surgery.  Plaintiff's stated improvement in his

10  symptoms following his surgeries is not a clear and convincing reason to reject his testimony

11  regarding his continued need to lie down during the day.

12         **C.      Whether the ALJ Properly Identified Jobs in the National Economy**

13                **1.      The ALJ's Hypothetical**

14         A hypothetical posed by the ALJ to the vocational examiner must be based on medical

15  assumptions supported by substantial evidence in the record that reflects each of the claimant's

16  limitations.  *Magallanes*, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ "is not free to disregard

17  properly supported limitations." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006).

18  However, the ALJ does not have to follow a plaintiff's recommendations for what elements should be

19  included in the hypothetical.  *Magallanes*, 881 F.2d at 756-757.  The testimony of the vocational

20  examiner, in turn, is sufficient to support a finding that a claimant is or is not disabled only if it is in

21  response to a hypothetical that accurately reflects the plaintiff's residual functional capacity.  *Robbins*,

22  466 F.3d at 886.  If a court finds the hypothetical to be inadequate because it fails to include all

23  properly supported limitations, it is not harmless error if the record suggests that it would have been

24  determinative as to the vocational examiner's recommendation to the ALJ.  *Andrews v. Shalala*, 53

25  F.3d at 1035, 1043-1044 (9th Cir. 1995).  On the other hand, the ALJ's error may be harmless in a

26

27  _____

    [4] Plaintiff explained his lack of medical visits for a period running from April 2008 to September 2009 by stating that
28  "[he] was feeling okay then."  AR, 67-68.  Plaintiff also testified that he continued to take medication and lie down during
    that time period. *Id.* at 67-68, 71/  Plaintiff's statement that he was "okay" for a limited period does not conflict with his
    continuing need to lie to rest and manage his pain during that same time period.

United States District Court
Northern District of California

1   social security case "where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's

2   ultimate disability conclusion." *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

3          Here, the ALJ's hypothetical is flawed in two respects.  First, it is flawed because the ALJ

4   improperly disregarded Plaintiff's need to lie down to rest for two hours in an eight hour workday, as

5   supported by Dr. Cabayan's opinion and Plaintiff's testimony.

6          Second, the hypothetical did not account for any type of rest periods.  On the other hand, the

7   ALJ's residual functional capacity assessment required "reasonable periods of rest."  Plaintiff's

8   attorney questioned the vocational examiner as to the effect of a ten-minute hourly break or two hours

9   spent lying down to rest in an eight hour day.  The ALJ found no justification for those restrictions.

10  However, the ALJ did not define what rest periods would be reasonable, or include any provision for

11  rest periods in his hypothetical.  Defendant argues that the "reasonable rest period" requirement would

12  be satisfied by either changes in position, which were addressed in the hypothetical, or the normal rest

13  breaks required by law.  Defendant's Motion, 8.  But there is no basis in the ALJ's opinion to

14  conclude, as Defendant does, that "reasonable periods of rest" do not include some amount of at-will

15  rest breaks that the ALJ would find reasonable.  Therefore, the hypothetical was incomplete.  The

16  record suggests that certain additional limitations as to rest periods would have been determinative as

17  to the vocational examiner's recommendation.  The Court cannot conclude that any error was

18  harmless because it is unclear what rest periods would have been reasonable, and how the vocational

19  examiner would have treated a hypothetical incorporating those reasonable rest periods.

20                  **2.        Treatment of Ciddio's Testimony**

21         Because the ALJ's hypothetical was incomplete, Ciddio's testimony is without evidentiary

22  value. *See Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) ("expert's testimony has no

23  evidentiary value to support a finding that the claimant can perform jobs in the national economy" if

24  the hypothetical does not reflect all the claimant's limitations).

25         **D.        Remedy**

26         "The decision whether to remand a case for additional evidence or simply to award benefits is

27  within the discretion of the court." *Reddick v. Chater*, 157 F.3d 715, 728 (9th Cir. 1998).  "Remand

28  for further administrative proceedings is appropriate if enhancement of the record would be useful.

*Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).  Conversely, "where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits."  *Id*.  With respect to an ALJ's improper disregard of evidence:

> [T]he district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id*.  *See also Lester*, 81 F.3d at 834 (where the ALJ "fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law'" (citation omitted)).

In this case, the Court has concluded that the ALJ failed to provide legally sufficient reasons for (1) rejecting Dr. Cabayan's opinion that Plaintiff's recovery had peaked in November 2007, at which point he required two hours of rest, lying down, in an eight hour workday; and (2) rejecting Plaintiff's testimony that he needed to lie down for much of the day.  The vocational examiner's testimony makes it clear that "if someone needed to lie down two hours out of an eight hour day [that would] eliminate all employment."  AR, 76-77.[5]  Therefore, crediting Dr. Cabayan's opinion and Plaintiff's testimony the Court concludes that there are no issues that must be resolved before a determination of disability can be made and that it is clear from the record that the ALJ would be required to find Plaintiff disabled.  The Court remands the case and orders an immediate award of benefits to Plaintiff.

//

//

//

//

//

---

[5] Plaintiff's attorney asked, "[I]f someone needed to lie down two hours out of an eight hour day would that eliminate all employment?"  The vocational examiner replied, "Yes, it would."

United States District Court
Northern District of California

**IV.      CONCLUSION**

  For the foregoing reasons, the Court GRANTS Plaintiff's Motion and DENIES Defendant's Motion.  The Court reverses the ALJ's decision and remands Plaintiff's claim for an immediate award of benefits.

  IT IS SO ORDERED.

Dated: April 5, 2013

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California